17-3794 David Jacobs v. Federal Housing Finance Agency Mr. Pittenger. Good morning. May it please the Court, Mike Pittenger on behalf of Plaintiffs Appellants David Jacobs and Gary Hines. The District Court dismissed Plaintiffs' claims challenging the Federal Housing and Finance Agency's implementation of the net worth sweep on the basis of 12 United States Code section 4617F, the so-called anti-injunction clause of the Housing and Economic Recovery Act of 2008 or HERA. As I'm sure that you will soon be hearing from Appellants, five circuit courts of appeal have dismissed stockholder claims challenging the net worth sweep on the basis of the anti-injunction clause. Counsel, it's not just an anti-injunction clause. The language says any remedy that would restrain or affect the exercise of. So there's case law talking about rescission, restitution. It seems like your entire theory here boils down to your claims fall in two baskets. One of them is the Third Amendment exceeded the statutory authority, but what you're seeking is to say it unjustly enriched the Treasury. So winning either of those winds up trying to undo the Third Amendment. How don't, how don't, how isn't it true that all of your claims don't in some way affect the exercise of their statutory authority? Well the, the, and you're right, anti-injunction, it is more broader than that. It's the courts in these five circuits have consistently held that it affects only equitable relief. Okay, but not all of them are confronted with this issue. Why should we agree with that, even those that did squarely face it? And that, that goes, I believe, to the question that the Court asked in its August 21st letter about damages and whether damages can, the amount of damages, for example, or other relief could potentially affect the exercise of powers by the FHFA. First, of course, I've already referenced the fact that these other courts and a lot of other courts construing the FIREA equivalent to this have also held that it only goes to equitable relief. But second, we submit that the amount of damages really cannot alter the analysis under 4617F. It would be a perverse result, frankly, if the FHFA could engage in wrongful conduct that causes enormous damages and there's, there's no way to seek relief and relief is precluded. But if the FHFA engages in wrongful acts that cause small amounts of relief, relief, or small amounts of harm, relief is available. That doesn't make sense. It would be very hard to draw the line and the statute, frankly, should be construed to preclude all judicial review of wrongs committed by the FHFA. And that's what construing it to preclude monetary relief that we seek here. What is the nature of the monetary relief here? We're at the motion to dismiss stage. And how can we tell from the face of the complaint what the value is of the compensatory damages that you're seeking? Well, on the motion to dismiss standard, I don't think that you necessarily have to determine what the value is. For one, the standard is have we stated a claim on which there's any plausible basis that you could have a claim for a remedy. And here we have sought damages against FHFA and we have sought monetary restitution, which is legal monetary restitution against Treasury. But monetary, the compensatory damages, it's for what? Is that the difference in dividends you would have received if there were what you, those would have been more reasonable dividends that were being taken by Treasury? Or if the Third Amendment simply weren't there at all, what your claims would have received? What is the nature of the compensatory damages issue? There are obviously a number of ways that damages can be looked at. And a court would have to, after trial and hearing expert testimony, figure out what is best, most, the most appropriate relief in the circumstances. But you're right, one way is to look at, if this had never been implemented, this net worth sweep, the Third Amendment, you go back to the Second Amendment and that's the 10% dividend and you look at how much has been paid out to Treasury under the Third Amendment, the net worth sweep, and in comparison to what would have been paid out if there would have just been the 10% dividend. And I believe in the aggregate for both companies, that's currently around $122 billion. Is there any way we could grant damages to you without declaring the Third Amendment invalid? I believe you would have to declare the rule that the Third Amendment violates the state law that we have alleged in the complaint. Would that not affect the exercise of powers to say that the entire Third Amendment was unlawful for buyers? Well, then that goes to the second basis that you had mentioned on which we argue that's just the error, and that's that this section 4617F does not apply, or does not apply to FHFA acted outside the scope of its statutory authority under HERA. And here, again, the five other circuits that I mentioned all found on the facts there that the FHFA had not acted outside of its statutory authority under HERA even if it violated something else and found that the 4617F barred the claim, so why again is our case any different? And it's because none of those other cases had the unique claims that we have here, which would be statutory claims, and none of them analyzed the issue, and we contend that if you accept all of the reasoning of those other five circuits, that you still need to reach a different result here because under HERA, FHFA stepped into the shoes of Fannie Mae and Freddie Mac and could have no more powers than those entities had under the law that the federal regulatory regime requires control their internal corporate governance. Well, it still brings all of its own powers as conservator or receiver, as the case may be, right? You're asking us to interpret the succession clause, which is under the header of general powers, and is talking about specifically their powers as a conservator as a limitation on the powers that they can exercise as conservator. Succeeding to those rights, why should we read that as only those rights as opposed to those rights in addition to what under their enabling statute that the conservator has in stepping into their shoes? Sure. The FHFA as conservator only has those powers granted to it in HERA 4617B2. And one of those provisions is B2A, which is the succession provision that I've mentioned where it's the step in the shoes, and that's the O'Melveny and Myers case from the U.S. Supreme Court, that under that you step into the shoes and only have the powers of the entities. But there are other provisions. You are right. You have to read the statute as a whole and look at each of those other powers. And they are powers such as taking over the assets of and operating the regulated entity with all the powers of the shareholders, directors, and officers of the regulated entity. I'll get you back to the same place if they don't have those powers under applicable law governing, which is state law here. So we first have this preemption issue. I want to hear you say a little bit about that. But under state law, the other thing is I don't see how this isn't – I mean, it's unusual, but state law permits a rate, even if the rate is 100 percent. It permits preferred shares of stock. This is in preference, even though it's a complete preference. So I think there's a colorable argument that's preempted. But even if it isn't, how is this a violation of the requirement that there be a rate payable in preference to the Treasury? The rate referred there is a rate of return on the capital investment or some relationship to that. And there are two issues under Delaware law. This is the Delaware Statute 151C. One is that there has to be a rate, and we contend that a rate of 100 percent of the positive net worth minus a small capital reserve is not a rate bearing any relation to the capital investment of Treasury or a stated value of their stock. It's completely different. And then second, we have the issue of it has to be in preference to or in relation to dividends on the other more junior securities. But this falls within the words. What you're really pleading is a huge violation of fiduciary duty. Unfortunately, a violation of fiduciary duty isn't actionable here, right? You have to show some violation of some particular statutes if Fannie and Freddie are bound by the state laws at all. And I think that you don't have an authority that says this can't be a rate or that can't be a preference. You're making common sense arguments, but they're really fiduciary duty arguments. And fiduciary duty alone isn't enough of a basis to say the conservator can't do that because the conservative obligation isn't just to the shareholders. It has obligations more broadly to the Treasury, for example. We are not making fiduciary duty arguments. We don't have fiduciary duty claims. We're making power arguments. And our premise is that 151C and the Virginia statute equivalent with respect to preferred dividends do not permit these features. We cite a Virginia case for example. Because of the magnitude of the features, right? That's what I'm wrestling with. It's 100% no good, but 10% is okay, 12% is okay, somewhere. You know, the higher it goes, the less you like it, right? It's not just magnitude. It's that it's everything. Right, so 99% is okay, but 100% is not. I don't believe it would be based on net worth. I will say I think 99.9% of the amount that Treasury invested as capital, if it's a rate of return tied to its investment or tied to some other feature of its stock, may well be a rate of return, which I believe is what rate is meant to be in the statute. But this is 100% of the entire positive net worth quarterly forever, leaving absolutely no chance of positive upside in the future. It's annihilation. You don't have to persuade me that it's not. But I'm struggling with what in the Delaware law or the Virginia law doesn't permit this type of remarkable exercise of corporate power. And my time is up. Would you like me to quickly answer? No, take your time. Again, I believe it's a statutory language. 151C, I have to admit I'm not aware of any Delaware case directly dealing with this issue because no one has ever done this before. Right, right. What are the hazards of doing business with the government? The language of subsection C says that the holder of preferred special stock shall be entitled to receive dividends at such rates on such conditions in such times as shall be stated in the certificate of corporation and in resolution or resolutions providing for the issue of such stock has been adopted by the board. Your argument seems to be that they can't peg it to net worth. They can't peg it to this or that. But the text of the statute doesn't have that limitation. Again, I believe that when you read the statute as a whole, which you must in the relationship between common and preferred stocks, one, and you read this statute as a whole, including the preference to or in relation to dividends payable in any other classes, and then when you read the next sentence of the statute that says when dividends upon the preferred and special stocks, if any, to the extent of the preference to which the stock or title shall have been paid and declared and set apart, a dividend on the remaining class or classes of series may then be paid. So it contemplates that there's something left for the common, and that's the general understanding of common. That's the Johnson & Johnson case that we cited from Virginia, that common stock is the stock that's taking all the risk, and they take that risk because they have potential for enormous future upside, whereas preferred stocks' risk is more limited, it's contractual, but they have more certainty. And this is turning that concept on its head by essentially giving the preferred stock everything forever and wiping out all the other stocks. None of these stockholders who reasonably invested based on knowing that Delaware or Virginia law was running the internal corporate governance and not Venezuela law would have expected that. But with your indulgence, I'd like to ask a little bit about the succession clause. And you and your adversaries have assumed Perry Capital's framework, but I'm not sure why that's right. Your theory is that these are, yes, they're derivative claims, but they're also direct claims. And there's this weird little pocket in Delaware law. I'm not sure it applies here. But I'm not sure why we should not find, even if these were direct claims, why they wouldn't be barred. Why do you think that a claim that's direct and derivative should survive? Well, one, the case law. It obviously says that, but there's a reason based on the statutory text as well, and that's that when the government succeeds to all the rights, titles, powers, et cetera, of stockholders, officers, directors, stockholders, reading the key here, it's with respect to the regulated entity and the assets of the regulated entity. Can you tell me where you are on this one? Oh, I'm so sorry. It's 4617B2A1i. A1. Okay, I see. Succeeds to all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, director, or such regulated entity, with respect to the regulated entity, the assets of the regulated entity. Okay. So that's not the contract rights of the stockholders. The stockholders that we cited in our briefs, state law, the charter, and the bylaws together form a contract. This is the rights of the entity, but also the rights of the stockholder. Why aren't they both covered? With respect to the entity and its assets, and that's why I believe the courts have held that it does not take the individual contract rights of stockholders, and that's why the contract claims, for example, in paired capital were allowed to be pursued. We'll hear you on your reserved time for rebuttal. Yes. We'll hear now from Mr. Cain. On behalf of HFA, correct? Yes. Yes. Thank you, Your Honor. Howard Cain for AFPLE, Federal Housing Finance Agency. Your Honors, I'd like to address a couple of the questions I asked, points made by plaintiffs, and the question asked by this Court. But this might take two to three minutes to give background on their claims, which I think in and of itself will answer many of the Court's questions. This is something that's totally ignored in plaintiff's appellant's briefs. When this case was originally filed in 2015, it had ten counts. In addition to the account, essentially the only allegation left, that state law is violated, plaintiffs had that. They alleged that the net worth sweep eliminates contract rights. There were fiduciary claims and went into great detail. And as the Court knows, for a while this case was stayed because there was an MDL proceeding, and the MDL panel considered combining a lot of cases. I think this might be the only one left because they weren't combined, and over time we've won all the other cases. But what I think it's important for the Court to realize is, plaintiffs made a tactical decision in the context of the MDL. What they did is they dropped counts three to ten. And I'll read you what plaintiffs said in doing it because it's very telling. And I'll refer the Court to the documents in which this is stated. In David Jacobs and Gary Hines Notice of Supplemental Information Concerning State Law Claims in Delaware Action, and this was filed on May 19, 2016, before the MDL panel, it says that the Jacobs plaintiffs have informed defendants that they intend to file, pursuant to Rule 41A1A, a Notice of Voluntary Dismissal without Prejudice of Counts 3-10 when the stay is lifted. And then they go on to say, Counts 3-10 of the complaint in the Delaware action are the state common law claims against defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. And then they continue, the only remaining claims, and a fundamental point I'd like to highlight is, very, very, very little is left of this case because plaintiffs dismissed the vast bulk of the counts that they originally alleged. We understand that we are confronted with an appeal of the dismissal of the claims that were raised in this case. But let's focus, as time is limited, for argument on whether, in fact, FHFA exceeded its authority under the statute. In oral arguments in the Saxon case before the Eighth Circuit, the Treasury said that if FHFA acted contrary to its charter, that would be ultraviarious. Do you agree with that? I don't, Your Honor, and I was at that argument representing the FHFA, and I heard it. Maybe that's how it came in the transcript, but that is not at all what I understood to be said, because what we're dealing with, and the courts have been very clear, powers, was did the FHFA exercise a power granted by Congress when it agreed to the amendments to the financing agreement that allows Freddie and Fannie to exist? And every case, I believe, Circuit Court has said, you're in the heartland. That is a quintessential power. No court has suggested that it was anything of a close call, whether the power exercised in this court, in this case, was granted by Congress. And, Your Honor, the one point that I wanted to make because of the court's questions about F and does it apply to damages, if the court were to go back and look at the original complaint, the court will see that the references to compensatory damages in the current complaint are really an artifact of counts that were deleted. Because in the original complaint, the court will see that with respect to the claims that are still left, counts one and two, and three and four, it says just repeat that for treasury, that no compensatory relief was requested. On the only count that are left, what plaintiffs asked for in the original complaint was granting appropriate, equitable, and injunctive relief to remedy wrongdoing, including rescission of the net worth sweep and restitution of the monies paid by the companies to treasury. And then in response to something you asked, Judge, I don't want to pronounce, I'll get it wrong. Sorry, Your Honor. Declaring that the net worth sweep is void and unenforceable as a matter of Delaware and Virginia law. All right, let's talk about the equities then. You say it's not a damages action anymore, it's an equity action. Why isn't it sort of shockingly unfair that since things have gone well in the intervening years after the disaster, to wipe out an entire class of preferred shareholders? I mean, there's something sort of shockingly unfair about that. Why did that happen? With all respect, Your Honor, what I believe is shockingly unfair is that plaintiffs' appellants left out the key points in the description of the facts. They treat this as if, and you see in the question stated, the FHFA stole billions of dollars. That's what they say. But what they ignore is this was a contractual transaction, and FHFA gave up a lot. There was back and forth. What they ignore, for example, is in addition to changing the dividend formula, there was something called a periodic commitment fee. Treasury, and that is a fee that would be paid to Treasury under the original agreement, and it says in direct terms the periodic commitment fee was to pay Treasury, i.e. the taxpayers, for the full ongoing value of the continuing commitment. There continues to be, to this day, a commitment of tax dollars by the Department of Treasury of over a quarter of a trillion dollars. That's sort of the capital backbone of these institutions, and that commitment fee was waived for so long as the dividends changed. So when they say you stole hundreds of billions of dollars, it ignores that. Maybe that fee would have been larger than this. We don't know. That supports, I think, that FHFA was negotiating in good faith. It cut a good deal. It did a good job during a time of financial strain and distress, but it still begs the question that once Treasury was getting an excellent rate of return, the taxpayers got the money back, why continue or why persist in wiping out this class of preferred shareholders? That's still a puzzling question, isn't it? Not about trying to wipe out any class, because when you look at these institutions, planners go, oh, they're so profitable now. These institutions, to meet capital guidelines, would need a lot of capital that they don't have. Because don't forget, they were taken over 10 years ago, and what the original deal was is Treasury will infuse money whenever the net worth goes below zero. But the way it was set up is we're not going to capitalize this at 3 percent or 6 percent or 10 percent, but we're going to keep the capital above zero. And the reason for that is there's a statutory provision here, the mandatory receivership, and it says if an institution has negative capital for either more than 30 or 60 days, the FHFA has no choice but to place it into mandatory receivership. So we've had from 2008 through 2012 a number of infusions totaling, I believe, $186 or $189 billion, and those infusions were made to bring it up to zero, not to capitalize. And they act as, oh, we have a soundly capitalized enterprise. No, Your Honor. What we have is we still have the original paradigm that continues to work, because the markets are accepting it and they're in business. And that was the goal, to allow the Fannie and Freddie to fulfill their primary congressional goal, which is to support the housing market. But it's not in business in the sense of paying off principal or maintaining it. It's not in the business of paying off principal or maintaining in any meaningful way the existing class of stockholders. So why in the description you just gave, doesn't that point up that FHFA here is really acting under its powers as receiver, not as conservator at the point of the period to set it? Absolutely not, Your Honor, because what a conservator does, and again, there have been a lot of cases where plaintiffs have argued that this is a historic receiver. You look at estates and things. No, it's a statutory receiver, and the way it works is the receiver has to make a decision. Can things be improved enough to restore it to the state it had been in previously, or are things so deteriorated that ultimately it has to go into receivership? But this is not a receivership now, Your Honor, as testified by these are very actively engaged in business. Receivership, you stop doing transactions and you liquidate assets. These are, again, on the basis of the Treasury's continuing quarter trillion plus dollar capital commitment. They are engaged in business every day. They're continuing to facilitate the housing markets. And Congress gave the conservator that authority because Congress wanted to facilitate the housing markets, even if Freddie and Fannie hit a financial rough patch, Congress tried to come up with something that rather than throwing them into receivership and perhaps devastating the housing markets during an interim period, they could remain in business, which they are. But there's no, and I would say with respect to Judge Hardiman, your question, there was no theft of hundreds of billions of dollars. There's no theft of a penny. A decision was made, and it can be agreed with or not. I believe the reasons are laid out in the department. I didn't ask you if there was a theft, or my question didn't presume there was a theft. My question was more mundane. Okay. Now that business is good, what is the reason for the FHFA to not make good on the commitments to the plaintiff class? Well, there are no commitments, with all respect, Your Honor, that haven't been satisfied. But we have an institution. They may be profitable day to day, but we're talking about hundreds of billions of dollars of capital that would need to be infused into these institutions for them to operate as a normal financial institution independently and on their own. That capital doesn't exist. Perhaps some investors will come, which we've never seen, or there will be an infusion from somewhere. But right now, on the basis of this quarter trillion dollars backup, the institutions are able to remain in business, but there is no basis for plaintiffs to complain, hey, these are ready to go back to the private sector. I mean, that takes enormous tens and tens and hundreds and hundreds of billions of dollars. I don't have the number, Your Honor, but we're not there. And in light of what happened in this class, the private sector may never have an interest, right? Your Honor, again, if you go back to the beginning, there were efforts to bring in capital. None of those efforts succeeded. And therefore, Congress passed special legislation here authorizing the Department of Treasury for a period of time to make unlimited contributions to Fannie and Freddie to keep them in business. And I mentioned the periodic commitment fee, which plaintiffs choose to ignore. The reason that is important is Congress, when it authorized Treasury to make these transactions, it made it very clear in everything you do here, your goal, you need to protect the taxpayers. And in protecting the taxpayers, that was what the periodic commitment fee was. A quarter of a trillion dollars capital there for the indefinite future is worth a lot of money. The fee that Treasury was supposed to get for that has been abated, has been given up, at least so long as the Third Amendment remains in effect. All right, let's hear from Treasury then. Thank you, Mr. King. Thank you. Mr. Sinsdak. May it please the Court, Jerry Sinsdak, appearing on behalf of the Department of Treasury. I guess your answer to this back and forth I've had with Mr. King is we're just the ones with the money. We're just the funder here. These aren't our decisions. And just to the equities, I'm not talking about the legalities of it. With respect to the equities, I do think it is important, as my colleague was pointing out, to bear in mind that it's Treasury's $250 billion commitment that's keeping these entities in operation. And it's what bailed them out in 2008. It's what keeps them in operation. And I also want to just be clear, this is spelled out in our brief. It's spelled out in the Roberts case and the Seventh Circuit, the D.C. Circuit case. And what was happening in 2012 is that under the initial 10 percent fixed-rate dividends, the entities, and this is undisputed facts, were drawing from the commitment just to pay those dividends. And so the Third Amendment came about to end that practice. And, in fact, it effectively ended that practice. And I would point out another thing going to the equities and also underscoring why this is a business judgment is that, yes, it's true, in 2013, 2014, Treasury made more under this Third Amendment than they would have under the 10 percent. But in 2015, 2016, they made less than they would have under that. So as the Seventh Circuit pointed out in Roberts, we really don't know the long-term effect on the companies of this, of whether they'll end up paying more or less. And not only that, I would also just emphasize, as your honors are well aware, we don't know how the conservatorship will end. It's been Treasury's position throughout. It's been Congress's position that Congress will do something. You guys are acting in good faith with FHFA, and this class is sort of collateral damage of the – Yes, I mean, I think it's – FHFA is under HERA. There's obviously nothing in HERA that places the shareholders' interests first and above all others. There's nothing in HERA that requires FHFA to return it to a private company at some point. What is in HERA is that it's supposed to act, A, in the best interests of either the GSEs themselves or the agency, which is generally viewed as the public's interest. And we know also it's Treasury's compelled or required to consider taxpayers' interests, consider the housing market's interests. And what's been done here is, and for the last – you know, it's now eight years since the Third – operating – these are incredibly important entities to the housing market – still doing all of what they've done throughout the years and still functioning. This is not – to get to Judge Krause's point, this is not a liquidation. If there's anything, this is not. It's a receivership and liquidation. Mr. Synsteck, are the damages claims still in this case? No, they're not, Your Honor. I mean, there's obviously the waiver arguments that have been made. These were not raised. In addition, they are also barred alternatively by the succession clause because these are derivative claims, but we think they weren't squarely presented. Certainly not against Treasury. Obviously, there would be a waiver of sovereign immunity issues if they tried – they never asserted a sovereign immunity that would permit damages against Treasury, and they never – you know. If we're going to look at law, federal law or state law for whether this is ultra-virus? Federal law, Your Honor. Okay. And what's the basis for opposing the application of D.C.? There are a few bases. One is HERA itself spells out the powers. Not only the powers that are granted, including the powers – the broad powers to operate the companies, to conduct their business and so forth, but it also specifies the terms on which FHFA can contract or the GSEs can contract with Treasury, specifically authorized Treasury to purchase securities on terms that were mutually agreed to by FHFA, on terms that would – that were determined by the Secretary of Treasury that would protect the taxpayer, that would – So what are your best two or three sections to point us to for that? Well, certainly for the general broad powers, it's under 4617, I think, B. They're set forth – I could find those easily enough. But where they talk about the – you know, the general powers to operate the regulatory entity, this is B2B and so forth. Yeah. In A2B2B, under the sections regarding Treasury's authority and the terms is under 12 U.S.C. 1455L, I believe is the section that they find out, and also 1719. One is Freddie, one is Fannie. And we cite those in our brief with respect to the terms under which they can negotiate or agree to it. So those control. And to the extent there was a conflict with state law, which we don't think there is for the reasons that have been discussed, but they would be preempted by those provisions in HERA. And it is HERA that we look to to determine whether an action is ultra-duress. And here, as numerous courts of appeals have held, the Third Amendment fits squarely within those actions and within those authorities under HERA. And therefore, it was authorized, and as this Court has held in Gross and Rosa, pointing to some other source of law as a potential violation is irrelevant. And, in fact, under plaintiff's theory, the anti-injunction provision would be superfluous or nugatory because you could enjoin under any state of federal law, you could enjoin it to the extent that you could enjoin the directors. And that's simply not a proper interpretation of HERA. Can you speak to the sovereign immunity defense and why when we're talking about restitution or discouragement as a remedy against the Treasury, it shouldn't be viewed as an equitable remedy? Well, Your Honor, I mean, we believe it is best viewed as an equitable remedy and therefore barred by 4617F to the extent that they're seeking it as compensation or substitute relief. That is, as the Supreme Court held in Blue Fox, would be considered compensatory damages and therefore would not fall within the APA waiver of sovereign immunity. So, you know, if it's truly an equitable, it's a little bit hard to say. I mean, monetary relief is always difficult under the APA, is what constitutes damages. Certainly plaintiffs under Bowen and so forth would have to identify a statutory duty or requirement in order to get money damages or money returned to them. And so they haven't made that out. So, you know, in general, if it's just a purely equitable relief and it is the thing to which they're entitled, then perhaps it would fit within the APA. We haven't argued that it isn't. But certainly if it's money damages, it's not covered by the APA. And therefore, there's no waiver of sovereign immunity with respect to that, with respect to treasuring. Your Honor, does anyone have further questions? Thank you, Mr. Stinsdak. We'll hear rebuttals from Mr. Pittenger. May I ask you to begin with what Mr. Kane said? Do you agree that counts three through ten are no longer at issue? We, well, yes, we have. We amended the complaint to focus in on the statutory issue. We didn't think with all these claims out there and all the other places. So we have counts one and two then. We have one, two, three, and four. One and two go to the statutory claims. One as to Fannie Mae, one as to Freddie Mac. Three and four go to the unjust enrichment claims against Treasury. But you're seeking equitable relief. We are seeking both equitable relief and damages and monetary restitution. And I don't know how anyone can claim that that's not the case. I'll refer the Court to both paragraph 21 of the complaint at A56 and request for relief F, G, H, I, J, K, and M. At A77 to 78, we seek restitution. We seek disgorgement. We seek damages. We seek equitable relief, all sorts of relief. There's no waiver here. The defendants below moved to dismiss on the basis of 4617F based solely on the equitable claims. They had other theories as to these other claims, but as to the equitable relief claims, that's all they moved to dismiss. They moved to dismiss the complaint in its entirety. They moved. If you look, though, at their briefing, it says we are moving to dismiss the equitable claims under 4617F. They don't argue they're seeking to dismiss other claims. Then they go on to address the other claims. I was shocked when Judge Slead held this complaint seeks only equitable relief. I'd never heard that before, so I was unable to argue it in the Court below because if there's any waiver here, it's waiver by defendants. They never made the argument. You didn't move for reconsideration on that? We did not. Let me just ask you about the equities because I was beaten up opposing counsel about that. I mean, if Treasury hadn't come to the rescue here with a pile of money, your clients would be wiped out, right? Well, no, that's not what we alleged in the complaint, and that's another error that the Court, we alleged. Fannie and Freddie were going to be able to make good on your dividends in 2008? Absolutely. That was part of the issue with Judge Slead's opinion and another ground of error we point out in our briefs is we've alleged in our briefs that they were on the brink of recovery and that what Treasury and FHFA did was capitalize on the fact they were on the brink of recovery to essentially nationalize this asset and make sure that all future upside profit forever went to Treasury and not to these other stockholders. And Judge Slead somehow bought into, and this is I think at A11 of the appendix in his opinion, this belief that they had to do this to prevent this never-ending cycle of taking draws in order to pay the dividend. We allege the opposite. I'll refer you to paragraph 42, which is A62, paragraph 14, which is A52, and 30 and 39. I don't have the A sites for those. 35, which is A59. The district court violated the fundamental principle that you construe the evidence or the pleadings in the light most favorable to the plaintiffs, and that permeated the entire decision. That was the lens through which Judge Slead viewed this entire motion. Counsel, could you just briefly address how is it that you are characterizing your request for money damages as something you're seeking to avoid the anti-injunction clause that you're not seeking when it comes to sovereign immunity? How does this both be true? So we have money damages against FHFA. I don't believe FHFA has ever contended that they have sovereign immunity. With respect to Treasury, we're seeking monetary restitution, which under Section 702 of the Administrative Procedures Act is not money damages, and so there's no sovereign immunity for restitution. Monetary restitution is not seeking compensatory damages. It's a different animal, and it's not monetary relief. So sovereign immunity does not apply to those claims against Treasury. But how about just putting that label on it? Are you making it equitable? Why isn't it that you're actually asking for legal damages? Let me be clear. It's not equitable restitution that we're seeking. It's monetary legal restitution. Equitable restitution would be a constructive trust or an equitable lien seeking specific property or sometimes a specific segregated fund. Restitution originated at law, and you think of quasi-contract and doctrines such as that originated at law. Here we're seeking substitutionary restitution of all of the money, what Treasury has usurped from the stockholders and from the entities, and that's legal monetary restitution. That is not compensatory damages, and that's not something that's covered by Section 702. Thank you, Your Honor. We respectfully request that you reverse the decision. All right. Thank you. We'll take the matter under advisement. We don't have rebuttal from your side. You could submit a 20HA letter if you would. Thank you.